J-S16020-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| HECTOR GONZALEZ | |
| Appellant | No. 3435 EDA 2014 |

Appeal from the Judgment of Sentence November 5, 2014
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s): CP-39-CR-0005117-2013

BEFORE: OTT, J., DUBOW, J., and JENKINS, J.

MEMORANDUM BY OTT, J.: **FILED AUGUST 16, 2016**

Hector Gonzalez brings this appeal from the judgment of sentence imposed on November 5, 2014, in the Court of Common Pleas of Lehigh County, following the denial of post-sentence motions on November 10, 2014. Gonzalez was found guilty by a jury of murder in the third degree[1] in the stabbing death of Ahiezer Padilla-Marrero (the victim). The trial court sentenced Gonzalez to 20 to 40 years' imprisonment. Gonzalez contends: 1) the evidence was insufficient to sustain a verdict of guilty to murder in the third degree when Gonzalez presented evidence of self-defense; 2) the trial court erred in denying his pretrial motion to suppress statements he made to

---

[1] 18 Pa.C.S. § 2502(c).

police while under interrogation; and 3) the trial court erred in permitting various photographs portraying the victim and the location of the homicide. *See* Gonzalez's Brief at 9–10.  Based upon the following, we affirm.[2, 3]

_____

[2] Initially, we note the delay in this case.

Counsel for Gonzalez filed a notice of appeal on November 19, 2014, and an amended notice of appeal on December 2, 2014. By order entered November 21, 2014, the trial court granted Gonzalez *In Forma Pauperis* status, ordered the court monitor to transcribe the notes of testimony of the trial held on September 30, 2014, through October 2, 2014, and ordered the court stenographer to transcribe the notes of testimony for the sentencing hearing held on November 5, 2014.  On December 3, 2014, the court entered an order directing the court monitor to transcribe the March 14, 2014 omnibus pretrial hearing.

The notes of testimony for the sentencing hearing were filed in the trial court on December 4, 2014.  The notes of testimony for the omnibus pretrial hearing were filed in the trial court on January 29, 2015.  On March 25, 2015, this Court received the certified record, including transcripts for the omnibus pretrial hearing and sentencing hearing, and one envelope of exhibits from the omnibus pretrial hearing, but no trial transcripts.

Having been granted two extensions of time, Gonzalez's brief was timely filed in this Court on July 20, 2015.  On August 17, 2015, the Commonwealth was granted an extension of time until October 19, 2015, to file its brief.  On October 16, 2015, the Commonwealth filed a request for a second extension of time, averring that the Commonwealth had not received the trial transcripts.  The Commonwealth was granted an extension of time until November 18, 2015, with no further extensions absent extraordinary circumstances.  On November 17, 2015, the Commonwealth filed a request for a third extension of time to file its brief, asserting that because the official court reporter had undergone a major surgery, she had been unable to complete the transcription of the trial proceedings, and that the trial transcripts were necessary for preparation of the Commonwealth's brief.  On November 30, 2015, this Court granted the Commonwealth's application for extension of time to file its brief and extended the deadline to December 18,
*(Footnote Continued Next Page)*

The trial court has summarized the Commonwealth's evidence, as follows:

> On September 28, 2013, at approximately 11:30 p.m., Francisca Olivo heard banging sounds and people running from the apartment above hers at [address omitted]. She then heard a knock at her door and someone asking for help in Spanish. Ms. Olivo opened the door and discovered a bleeding man standing in her front porch area. Ms. Olivo noted that the individual seemed pale and weak and she sat the man on a chair on the porch. Ms. Olivo directed someone else within her apartment to call 9-1-1. Ms. Olivo's sister-in-law, Wanda Mendez, began to apply pressure to the man's wounds which were on his chest, leg and arm.
>
> Shortly thereafter, members of the Allentown Police Department responded to [address omitted] for a report of a stabbing. Officer Craig Berger was the first officer on scene and observed the victim, later identified as Ahiezer Padilla-Marrero, slumped over on a chair to the left of Ms. Olivo's front door, surrounded by a group of people. Officer Berger observed that [the victim]

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

2015. The Court further ordered the Commonwealth to update this Court, in writing, by December 11, 2015, as to the status of the transcriptions.

On December 11, 2015, by letter, the Commonwealth advised this Court that the trial transcripts had not been transcribed despite additional requests directed to the official court reporter. The Commonwealth filed its brief on December 18, 2015.

This appeal came before this panel on February 1, 2016. On May 3, 2016, Volumes II, III, and IV of the trial testimony, and one envelope of trial exhibits were filed with this Court. Volume I of the trial testimony was filed with this Court on July 14, 2016.

[3] By order of November 21, 2014, the trial court directed Gonzalez to file a Pa.R.A.P. 1925(b) statement. On December 24, 2014, Gonzalez filed a motion for extension of time to file his Rule 1925(b) statement. Gonzalez filed his concise statement on January 30, 2015.

had an apparent stab wound to the center of his torso, was covered in blood, and was non-responsive. He radioed EMS and directed them to come to the scene immediately.

At that point, Officer Michael Yetter had arrived on scene and stayed with the victim and witnesses. Officer Berger proceeded to the front apartment building door and observed blood droplets on the steps, leading into the building. He followed those blood droplets to Apartment D3. At that point, Officer Kyle Pammer joined him and they determined that the apartment door was locked. The officers knocked on the door, paused for 20 seconds, knocked again on the door, and announced their presence as police officers. Officer Berger radioed the police sergeant and advised that he and Officer Pammer were going to enter the apartment. Sergeant Alicia Conjour, now positioned outside of the apartment building, advised that she observed a male appear in a window of the apartment.

When no response was made from the inside of the apartment, Officer Berger delivered one kick to the door and was able to enter the apartment with Officer Pammer. Upon entering the apartment, they observed that the apartment was in disarray and noted a dining room and kitchen off to their right. They observed a kitchen to the right of the dining room. As they cleared the area, they observed blood on the carpet, walls, furniture and kitchen sink area. Inside the sink, Officer Pammer observed three or four knives which were wet, and blood in the sink. After clearing the kitchen living areas, the officers heard footsteps and heard a door close.

The officers noticed two doors to the rear of the apartment. The left door was open and Officer Berger was able to determine that the door led to a bathroom. The door to the right was closed. Officer [David] Howells, now present in the apartment, announced that whoever was inside should come out. Approximately 10 to 15 seconds later, a male emerged, wearing only blue jeans or shorts. The man had blood spatter on his face and chest area and kept looking back into the room, which was ultimately determined to be the only bedroom in the apartment. The male appeared hesitant and kept looking back into the room, causing other officers to train their Taser guns on the male. Ultimately, Officer Berger handcuffed him. The male was identified as [Gonzalez]. The officers discovered [Gonzalez's] two minor children inside the bedroom.

Once handcuffed, [Gonzalez] was led to the kitchen area and was seated at the dining room table. Officer Berger noted injuries to his head and blood on his torso. He contacted EMS to respond to the apartment to treat [Gonzalez]. Officer Berger then obtained basic information from the male, including his name and date of birth, and kept him under observation. Officer Berger also observed blood spatter and a dent in the drywall in the dining area. While seated at the table, [Gonzalez] began to talk to Officer Berger, despite not being asked any questions by the officers on scene. Speaking in "broken" English, [Gonzalez] related that the victim had eaten all of the food [Gonzalez] had previously prepared for his children and that [Gonzalez] felt disrespected. [Gonzalez] confronted the victim and the victim punched [Gonzalez] in the face. The victim grabbed a knife and [Gonzalez] responded by grabbing a knife himself. He then repeatedly asked Officer Berger, "What would you do?" Officer Berger did not answer [Gonzalez], nor did he ask him any questions.

When EMS arrived, Officer Berger asked them to check [Gonzalez] for injury or if he was in need of medical treatment. [Gonzalez] refused medical treatment.

Detective Raymond Ferraro had arrived on scene and began to speak with [Gonzalez], again obtaining basic information. He was able to observe blood splatter on [Gonzalez] and that there was an injury near [Gonzalez's] eye. Detective Ferraro, unable to speak Spanish, believed that there may be a language barrier and requested that Officer Miguel Villa respond to the scene to assist in translation. Officer Villa is bilingual in Spanish and English. Detective Ferraro, Officer Villa, and [Gonzalez] were seated at the kitchen table and Officer Villa advised [Gonzalez] of his *Miranda*[4] warnings in Spanish, after Detective Ferraro read them aloud in English. [Gonzalez] verbally acknowledged that he understood his rights and was also given a written *Miranda* warning form to read, which was written in both English and Spanish. [Gonzalez] read the form and signed it with his right hand, acknowledging that he understood his rights, in

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Officer Villa's presence. [Gonzalez] appeared sober and responded in both English and Spanish to questions posed to him. At that point, Detective Ferraro was treating the incident as a stabbing investigation and [Gonzalez] was taken to police headquarters.

At some later point in time, Detective Ferraro was informed that the victim had succumbed to his injuries. At that point, Detective Ferraro requested the assistance of Lehigh County Detective Joseph Vazquez, a member of the Homicide Task Force. Detective Vazquez went to the scene, made observations, and proceeded to police headquarters.

At headquarters, a videotaped interview with [Gonzalez] was conducted. [Gonzalez] was informed that Detective Vazquez spoke Spanish and was available to translate during the interview. [Gonzalez] was again *Mirandized*, and he again completed the written waiver of his rights. The detectives first obtained biographical information from [Gonzalez] and advised him that they wanted to speak to [Gonzalez] regarding what had transpired in the apartment. Thereafter, the detectives advised [Gonzalez] that the victim had died. [Gonzalez] immediately began to cry.

During the course of the interview, [Gonzalez] changed his story several times. First, he indicated that he did not know what happened. Next, he stated that the victim had stabbed himself. Then, [Gonzalez] indicated that indeed he and the victim had fought, but that if the victim had been stabbed, [Gonzalez] didn't remember stabbing him. Finally, after Detective Ferraro disclosed that the victim had suffered a stab wound to the back, [Gonzalez] once again indicated that he did not know what had happened.

The detectives presented [Gonzalez] with several scenarios of what may have happened, including one in which [Gonzalez] was acting in self-defense, but [Gonzalez] refused to agree with any of the scenarios posed by the detectives. [Gonzalez] denied stabbing the victim.

On September 30, 2013, an autopsy was performed by Dr. Barbara Bollinger, a forensic pathologist and expert in forensic pathology. Dr. Bollinger determined that the victim's cause of death was multiple sharp force injuries and the manner of death

was homicide. Specifically, Dr. Bollinger found a large, gaping stab wound to the victim's chest approximately 2.5 to 3.5 inches in depth, which had plunged into the victim's heart. Dr. Bollinger opined that this was a lethal wound and the victim would have succumbed to the wound within minutes. Further, she found a stab wound to the right aspect of the victim's neck, which had perforated the small internal jugular vein. She opined that this was another fatal stab wound. Dr. Bollinger testified that the wounds were consistent with the use of two different knives.

Dr. Bollinger found several other superficial wounds on the victim's torso, back, shoulders, back of wrists, forearms, left thigh and knee. She further opined that some of these wounds could be categorized as defensive wounds.

[Gonzalez] testified at trial, telling the jury that he and the victim were family friends and that he had known the victim while the two of them lived in Puerto Rico. He stated that approximately one and a half weeks before this incident, he had permitted the victim to stay in his apartment, so long as the victim agreed to follow [Gonzalez's] house rules. Specifically, [Gonzalez] wanted the apartment to remain clean and for the victim to refrain from using [Gonzalez's] personal hygiene items. While staying at [Gonzalez's] apartment, the victim slept on a mattress in the living room area.

On September 28, 2013, [Gonzalez] had returned in the late evening with his children, ages 2 years and 1 year old. The victim was at the apartment when they arrived home. [Gonzalez] and children greeted the victim and [Gonzalez] proceeded to bathe his children and attempted to feed them. [Gonzalez] testified that earlier in the day, he had made rice for the children. When [Gonzalez] checked the pot still on the stove, he discovered that there was not enough for the children to eat.

[Gonzalez] confronted the victim regarding the missing food and the two began to argue. Their verbal argument got louder and one of the young children appeared to be scared. [Gonzalez] testified that he asked the victim to lower his voice and that if he couldn't calm down, that he should go outside of the apartment to cool down. [Gonzalez] began to take his children into the bedroom.

[Gonzalez] further testified that just before he entered the bedroom with his children, the victim punched him in the head, causing [Gonzalez] to strike the child he was carrying. [Gonzalez] put the children in the bedroom and reemerged. [Gonzalez] stated that he pushed the victim and told him that he didn't want him at his house anymore because [Gonzalez] had been disrespected. As the victim was walking backwards out of the bedroom area, [Gonzalez] began to punch the victim.

The physical altercation continued as the victim walked into the dining room area. [Gonzalez] testified that the victim pushed him into a wall, causing him to fall down. [Gonzalez] was able to get up and the fight continued in the corner of the dining room. [Gonzalez] testified that the victim then entered the kitchen, opened a drawer, and retrieved a knife. [Gonzalez] testified that he told the victim to calm down and to leave the apartment.

[Gonzalez] further testified that the victim stated that he wanted to continue the fight and brandished a knife. [Gonzalez] attempted to grab the victim's hand in order to take away the knife. He was unsuccessful and the fight continued. At some point, the knife fell onto the ground and the victim grabbed [Gonzalez] by his neck and threw him to the floor. [Gonzalez] testified that he was throwing punches and kicking at the victim when he felt something on the floor. [Gonzalez] then struck the victim with the knife, attempting to get the victim to stop fighting and/or choking him. [Gonzalez] characterized his knife use as a "poke," intended only to force the victim to let go of him. [Gonzalez] continued to "poke" at the victim.

A short time later, [Gonzalez] realized that he had blood on him and went to his children to calm them. He then saw the victim leaving the apartment, went to the apartment door to lock it, and noticed blood on the doorknob. [Gonzalez] then went into the bathroom and washed his hands. He also discovered the bleeding wound over his eye.

On cross examination, [Gonzalez] admitted that he had a confrontation with the victim and that he caused the victim's death. He further admitted that he did not inform the police that the victim punched him first to start the altercation, nor did he inform them that the victim choked him in the course of the fight. [Gonzalez] believed that the victim's stab wounds must

have occurred in the course of their altercation and denied deliberately stabbing the victim.

Trial Court Opinion, 3/16/2015, at 3–9.[5]  The trial court charged the jury on murder in the first degree, murder in the third degree, and voluntary manslaughter.  The jury found Gonzalez guilty of murder in the third degree.

In his first issue, Gonzalez challenges the sufficiency the evidence to sustain his conviction.[6]  Gonzalez argues the Commonwealth failed to disprove his claim of self-defense, specifically, he claims he "was confronted with a much larger individual who had already shown disrespect for [Gonzalez] and his children and who [Gonzalez] had reason to fear." Gonzalez's Brief at 20.  Gonzalez contends "the record did not support any reasonable inference that the taking of food would lead to [Gonzalez] having the requisite malice required to support his conviction." *Id.* at 20–21.  He asserts that "his testimony and a review of all evidence shows how he was

_____

[5] Gonzalez also presented the prior criminal record of the victim, showing that the victim had three simple assault convictions, in 2005 (12 months' probation), 2010 (12 months' probation), and 2011 (7–23 months' imprisonment).  *See* N.T., 10/2/2014, at 127–135.  It was stipulated that Gonzalez was convicted of simple assault in 2013, and received 12 months' probation.  *Id.* at 137.

[6] We must address this issue first, since a successful sufficiency of the evidence challenge warrants discharge on the pertinent crime. *Commonwealth v. Toritto*, 67 A.3d 29, 33 (Pa. Super. 2013).

the victim of an assault that he responded to and while it unfortunately led to his use of deadly force that force was necessary to protect himself." ***Id***. at 21. Gonzalez maintains "the record does not support any finding that he acted unreasonably, that he provoked the use of force, or that he had to retreat while he was in his own home and [the victim] was his guest." ***Id.***

The principles that guide our review are well settled:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Ventura***, 975 A.2d 1128, 1142 (Pa. Super. 2009).

> Third degree murder occurs when a person commits a killing which is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice. Malice is not merely ill-will but, rather, wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty. Malice may be inferred from the use of a deadly weapon on a vital part of the victim's body. Further, malice may be inferred after considering the totality of the circumstances.

***Commonwealth v. Son Truong***, 36 A.3d 592, 597-98 (Pa. Super. 2012) (quotations and citations omitted).

Section 505 of the Crimes Code sets forth self-defense rights and limitations, and provides, in relevant part:

> (a) Use of force justifiable for protection of the person. — The use of force upon or towards another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.
>
> (b) Limitations on justifying necessity for use of force. —
>
> …
>
> (2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:
>
> (i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or
>
> (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

18 Pa.C.S.§ 505(a), (b)(2)(i)-(ii).

> If the defendant properly raises "self-defense under Section 505 of the Pennsylvania Crimes Code, the burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant's act was not justifiable self-defense." ***Commonwealth v. McClendon***, 2005 PA Super 164, 874 A.2d 1223, 1229-30 (Pa.Super. 2005).

- 11 -

> The Commonwealth sustains this burden if it establishes at least one of the following: 1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; or 2) the accused provoked or continued the use of force; or 3) the accused had a duty to retreat and the retreat was possible with complete safety.

*Commonwealth v. Hammond*, 2008 PA Super 128, 953 A.2d 544, 559 (Pa.Super. 2008), *appeal denied*, 600 Pa. 743, 964 A.2d 894 (2009) (quoting *McClendon, supra* at 1230). The Commonwealth must establish only one of these three elements beyond a reasonable doubt to insulate its case from a self-defense challenge to the evidence. *Commonwealth v. Burns*, 2000 PA Super 397, 765 A.2d 1144, 1149 (Pa.Super. 2000), *appeal denied*, 566 Pa. 657, 782 A.2d 542 (2001). The Commonwealth can negate a self-defense claim if it proves the defendant did not reasonably believe he was in imminent danger of death or great bodily injury and it was necessary to use deadly force to save himself from that danger. *Commonwealth v. Sepulveda*, 618 Pa. 262, 289, 55 A.3d 1108, 1124 (2012).

> The requirement of reasonable belief encompasses two aspects, one subjective and one objective. First, the defendant must have acted out of an honest, bona fide belief that he was in imminent danger, which involves consideration of the defendant's subjective state of mind. Second, the defendant's belief that he needed to defend himself with deadly force, if it existed, must be reasonable in light of the facts as they appeared to the defendant, a consideration that involves an objective analysis.

*Commonwealth v. Mouzon*, 617 Pa. 527, 551, 53 A.3d 738, 752 (2012). As the *Mouzon* Court observed, the use of deadly force itself "cannot be viewed in isolation with [the victim] as the sole physical aggressor and [the defendant] acting in responsive self-defense. [T]his would be an incomplete and inaccurate view of the circumstances for self-defense purposes." *Id.* at 549, 53 A.3d at 751. To claim self-defense, the defendant must be free from fault in provoking **or escalating** the altercation that led to the offense, before the defendant can be excused from using deadly force. *Id.* (emphasis added). Likewise, the Commonwealth can negate a self-defense claim by proving the

- 12 -

defendant "used more force than reasonably necessary to protect against death or serious bodily injury." ***Commonwealth v. Truong***, 2012 PA Super 8, 36 A.3d 592, 599 (Pa.Super. 2012) (*en banc*).

When the defendant's own testimony is the only evidence of self-defense, the Commonwealth must still disprove the asserted justification and cannot simply rely on the jury's disbelief of the defendant's testimony:

> The "disbelief of a denial does not, taken alone, afford affirmative proof that the denied fact existed so as to satisfy a proponent's burden of proving that fact." The trial court's statement that it did not believe Appellant's testimony is no substitute for the proof the commonwealth was required to provide to disprove the self-defense claim.

***Commonwealth v. Reynolds***, 2003 PA Super 400, 835 A.2d 720, 731 (Pa.Super. 2003) (quoting ***Torres, supra***). If there are other witnesses, however, who provide accounts of the material facts, it is up to the fact finder to "reject or accept all, part or none of the testimony of any witness." ***Commonwealth v. Gonzales***, 415 Pa. Super. 564, 609 A.2d 1368, 1370 (Pa.Super. 1992).

A number of factors, including whether complainant was armed, any actual physical contact, size and strength disparities between the parties, prior dealings between the parties, threatening or menacing actions on the part of complainant, and general circumstances surrounding the incident, are all relevant when determining the reasonableness of a defendant's belief that the use of deadly force was necessary to protect against death or serious bodily injuries. ***See Commonwealth v. Soto***, 657 A.2d 40, 441 Pa. Super. 241 (Pa.Super. 1995) (concurring opinion by Olszewski, J.) (collecting cases for this general proposition). No single factor is dispositive. ***Id.*** Furthermore, a physically larger person who grabs a smaller person does not automatically invite the smaller person to use deadly force in response. ***Commonwealth v. Hill***, 427 Pa. Super. 440, 629 A.2d 949 (Pa.Super. 1993).

***Commonwealth v. Smith***, 97 A.3d 782, 787 (Pa. Super. 2014).

Based on our careful review, we conclude the Commonwealth's evidence supports the jury's verdict of murder of the third degree. The Commonwealth showed Gonzalez felt "disrespected,"[7] that he confronted the victim and a struggle ensued, that the victim suffered fatal stab wounds to the chest and neck, and that the victim's wounds were not self-inflicted. The Commonwealth presented evidence including Gonzalez's statements to police at his apartment and at police headquarters;[8] photographs of the

_____

[7] N.T., 9/30/2014, at 87 (direct examination testimony of Officer Craig Berger).

[8] Officer Berger testified that at the apartment, Gonzalez stated that "[w]hen he went to confront [the victim] about [eating all of his food] that [the victim] had punched him in the face." N.T., 9/30/2014, at 88. Officer Berger further testified "[Gonzalez] then stated that [the victim] grabbed a knife and [Gonzalez] stated that he grabbed the knife and then he kind of ended right there." *Id.* Gonzalez did not go any further; he asked the officer, "What would you do?" *Id.* at 89, 100.

After Gonzalez was *Mirandized* at police headquarters, he told Detectives Vasquez and Ferraro during questioning that the victim had stabbed himself, and that he didn't know what had happened. *See* N.T., 10/1/2014, at 51–52 (direct examination testimony of Detective Vasquez), 169–170 (direct examination testimony of Officer Ferraro).

Detective Vasquez testified that at the interview at police headquarters "[w]e did everything from offering him the explanation of … him defending himself where the victim may have attacked him to him defending himself by going to get another knife, taking the knife from the victim to use against the victim, in – in his own self-defense and as you will see that none of that – he wouldn't agree to any of that." *Id.* at 52.

Detective Ferraro testified the content of what Gonzalez stated in the interview was basically the same as he had stated after he was *Mirandized*
*(Footnote Continued Next Page)*

- 14 -

crime scene,[9] of Gonzalez at the crime scene,[10] and of the injuries of the

victim;[11] and a forensic pathologist, who testified regarding the nature of the

_(Footnote Continued)_ _____

and questioned at his apartment by Detective Ferraro with the interpretation assistance of Officer Villa. *Id.* at 169, 162–169.

The Commonwealth played the police headquarters interview video at trial, and the jurors followed along with the transcript. *See* N.T., 10/1/2014, at 176–177, 185–190; Commonwealth Exhibits 28 (interview transcript/translation) and 69 (recorded interview).

[9] The photographs included photographs of blood spatter in the apartment, and a photograph of two knives in the kitchen sink and blood around the sink area. *See* N.T., 9/30/2014, at 72; Exhibits 20 and 21. Detective Vasquez testified he saw water with a reddish tint in the sink. N.T., 10/1/2014, at 34.

[10] Officer Berger testified he saw that Gonzalez had a laceration on the head, other small lacerations, a cut to his hand, and was covered in blood spatter. N.T., 9/30/2014, at 78–82. When EMS arrived, Gonzalez refused treatment. *Id.* at 91–92.

Detective Vasquez testified that at police headquarters, the only injuries he identified on Gonzalez were an abrasion above his eye where it appeared he had been punched, and some "very superficial lacerations" on two of his fingers – the index and middle finger. N.T., 10/1/2014, at 36–37. Gonzalez was covered in blood. *Id.* at 38. Officer Vasquez did not observe any cuts or slashes or knife wounds. *Id.* Detective Vasquez testified that in his experience when an individual stabs a person, their hand will slide over the top of the knife and "you get small cuts from either the top end of the blade or the blade itself[.]" *Id.* at 39. He stated when he observed Gonzalez's hand, he saw these small lacerations inside Gonzalez's fingers. *Id.* at 39–40.

[11] The victim's injuries included a stab wound to the right side of the neck of about one inch, a wound on the left side of his chest of approximately two inches, slight stab wounds on the back of the victim, and a stab wound on the victim's left leg near the kneecap. *See* N.T., 10/1/2014, at 78–81.

victim's wounds.[12]  Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, the jury could properly conclude that the Commonwealth's evidence negated Gonzalez's self-defense claim. Specifically, based on the evidence presented by the Commonwealth and reasonable inferences derived therefrom, the jury could find that Gonzalez did not reasonably believe that deadly force was necessary or that Gonzalez used more force than reasonably necessary and that Gonzalez was not free from fault in provoking or continuing the use of force.  Accordingly, we find Gonzalez's challenge to the sufficiency of the evidence to establish third degree murder warrants no relief.

_____

[12] Dr. Bollinger testified the cause of death was "multiple sharp force injuries" and the manner of death was homicide. N.T., 10/1/2014, at 120. She identified "nine sharp force injuries" and also "areas of blunt force trauma." *Id.* at 121.  She noted a "gaping" wound in the victim's left chest area.  *Id.* at 125.  That wound measured one and seven-eighth inches across, and two and one-half to three and one-half inches deep, and the heart was penetrated by the knife. *Id.*  The wound was lethal.  *Id.* at 127. Another lethal wound was a one-half inch stab wound to the right aspect of the victim's neck, and the tributaries of the jugular vein were penetrated by the knife. *Id.* at 128-130.  Dr. Bollinger testified the wounds "may very well be" consistent with two separate knives. *Id.* at 131.   Dr. Bollinger noted other superficial incised wounds to the victim's torso and extremities, including a larger wound over the left thigh and knee. *Id.* at 132.  Dr. Bollinger testified that wound may be a defensive wound. *Id.*  at 134.  Dr. Bollinger also stated there was "some blunt force trauma to the head." *Id.* at 138.

Gonzalez next claims the trial court erred in denying his motion to suppress statements that he gave to police at the scene and at police headquarters. Specifically, he argues:

[Gonzalez] does not contest that he was given his Miranda Rights at the scene and at police headquarters; however, he does believe that a review of the testimony shows that the statements were given to an individual who had just gone through an extremely traumatic occurrence. There was no doubt that [Gonzalez] had suffered from some type of assault regardless of whether or not it was of his own actions or caused by the victim. There was also evidence that [Gonzalez] had suffered physical injuries resulting from the altercation. Additionally, the voluntariness of [Gonzalez's] consent was based upon an assumption that he could understand the explanations of his rights regardless of his lack of understanding of the English language. [Gonzalez] had suffered physical injuries from the altercation with the victim and, on at least one occasion, had requested access to bathroom facilities but was denied such access. In summary, the environment in which statements were given was so coercive as to strip from the process any voluntariness in [Gonzalez's] actions.

Gonzalez's Brief at 24–25.

Our standard of review is, as follows:

In reviewing a suppression court's denial of a suppression motion,

we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous.

*Commonwealth v. Jones*, 605 Pa. 188, 988 A.2d 649, 654 (Pa. 2010) (citing *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 842 (Pa. 2003)). Nonetheless, we exercise plenary

review over the suppression court's conclusions of law. *Id*. (citations omitted).

*Commonwealth v. Johnson*, 107 A.3d 52, 93 (Pa. 2014).

> When deciding a motion to suppress a confession, the touchstone inquiry is whether the confession was voluntary. Voluntariness is determined from the totality of the circumstances surrounding the confession. The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. The Commonwealth has the burden of proving by a preponderance of the evidence that the defendant confessed voluntarily.

*Commonwealth v. Nester,* 551 Pa. 157, 162-163, 709 A.2d 879, 882 (1998) (citations and footnote omitted).

> When assessing voluntariness pursuant to the totality of the circumstances, a court should look at the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion.

*Id.* at 164, 709 A.2d at 882 (citations omitted). "The determination of whether a confession is voluntary is a conclusion of law and, as such, is subject to plenary review." *Commonwealth v. Templin,* 568 Pa. 306, 310, 795 A.2d 959, 961 (2002), citing *Nester, supra.*

*Commonwealth v. Harrell*, 65 A.3d 420, 434 (Pa. Super. 2013).

The trial court has provided a cogent analysis of Gonzalez's statements to police in his home and at police headquarters, and our review confirms that there is no basis upon which to disturb the trial court's denial of the motion to suppress. Moreover, because we conclude further elaboration is

unwarranted, we adopt the trial court's pre-trial opinion regarding Gonzalez's suppression as our own for purposes of this appeal. *See* Trial Court Opinion, 5/27/2014. Therefore, we reject Gonzalez's suppression challenge.

Finally, Gonzalez claims the trial court erred in its evidentiary ruling that allowed into evidence various photographs of blood spatter, pools of blood, and the deceased victim.

In ***Commonwealth v. Robinson***, 864 A.2d 460 (Pa. 2004), the Pennsylvania Supreme Court set out the law to be applied in these circumstances:

> It has been a steadfast principle of our jurisprudence that pictures of the victim are not *per se* inadmissible. In relation to admissibility of these photographs, we have promulgated the following test:
>
> > [A] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. If an inflammatory photograph is merely cumulative of other evidence, it will not be deemed admissible.
>
> "The admissibility of photos of the corpse in a homicide case is a matter within the discretion of the trial court, and only an abuse of discretion will constitute reversible error." As we also explained …:
>
> > A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the

subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt. Further, the condition of the victim's body provides evidence of the assailant's intent, and, even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs.

**Robinson**, 864 A.2d at 501–502 (citations omitted).

Here, the record reflects objections were raised **only** with regard to six photographs, which were all photographs of the deceased. **See** N.T., 10/1/2014, at 65. The trial court allowed admission of two of these photographs, Exhibits 31 and 32. **See id.** at 70.

The trial court, in support of its ruling explained:

At trial, counsel for [Gonzalez] objected to the admission of several autopsy photographs, specifically Commonwealth Exhibit 31 (depicting a stab wound to the victim's chest), Exhibit 32 (depicting a close-up photograph of the stab wound to the victim's chest), Exhibit 33 (depicting a stab wound to the victim's leg), Exhibit 59 (depicting the upper body of the victim), Exhibit 60 (depicting the victim's chest and arms), and Exhibit 65 (depicting the victim's left leg). After argument, the Court determined that Commonwealth Exhibits 33, 59, 60, and 65 would be excluded. Prior to being shown these photographs, the Court issued a cautionary instruction to the jury, to warn them that the photographs were unpleasant but valuable in their consideration and to ask the jurors to be dispassionate in their consideration of the photographs.

> The Court has reviewed the photographic evidence actually admitted at Trial, and based on the relevant case law and the individual photographs themselves, we believe the admission of the photographs were probative of [Gonzalez's] intent to kill, his assertion of self defense, …, and the manner of the victim's death.

Trial Court Opinion, 3/16/2015, at 16–17.

We have reviewed Commonwealth's Exhibits 31 and 32, and we discern no abuse of discretion in the trial court's decision to admit these photographs. Although Gonzalez argues that the photographs were unnecessary because there was no question that the victim died from stab wounds and expert testimony set out the cause of death,[13] "the fact that a medical examiner can describe the victim's wounds to the jury does not render photographs of those wounds irrelevant." **Commonwealth v. Haney**, 131 A.3d 24, 38 (Pa. 2015) (quotations and citation omitted). The trial court carefully weighed the evidentiary value of the six, objected-to photographs, and excluded all but two, finding Exhibits 30 and 31 were probative in assisting the jury on the issues of intent to kill and self defense. Moreover, prior to publishing the exhibits to the jury, the trial court issued a cautionary instruction, **see** N.T., 10/1/2014, at 77–78, and the jury is presumed to have followed the court's instruction. **See Commonwealth v.**

---

[13] Gonzalez's Brief at 22.

***Walter***, 119 A.3d 255, 286-87 (Pa. 2015), *cert. denied*, ___ U.S. ___

(January 25, 2016).  Accordingly, Gonzalez's final claim fails.

Judgment of sentence affirmed.[14]

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/16/2016

---

[14] In the event of further proceedings, the parties are directed to attach the trial court's May 7, 2014 opinion addressing Gonzalez's motion to suppress.

Received 07/20/2015 Superior Court Eastern District

Filed 07/20/2015 Superior Court Eastern District
3435 EDA 2014

PD
Burkot

# IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA

vs.                                                     No. 5117/2013

HECTOR GONZALEZ,
     Defendant

## ORDER

**AND NOW**, this 7th day of ~~April~~ May, 2014, upon consideration of the Defendants' Omnibus Pretrial Motions, filed on January 7, 2014, a Hearing/ Oral Arguments held on March 14, 2014, and arguments and letter briefs submitted by Counsel for the Commonwealth and for the Defendant,

**IT IS HEREBY ORDERED** that the Defendant's Omnibus Pretrial Motion is **DENIED**.

BY THE COURT:

_____
KELLY L. BANACH,   JUDGE



RECEIVED
MAY 07 2014
PUBLIC DEFENDER OFFICE
LEHIGH COUNTY

IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA

vs.

HECTOR GONZALEZ,
Defendant

No. 5117/2013

OPINION

**KELLY L. BANACH, J.:**

On December 16, 2013, the above-captioned Defendant was arraigned on one count of Criminal Homicide (Pa.Con.Stat.Ann. §2501). On January 7, 2014, Omnibus Pretrial Motions (hereinafter "OPTM") were filed by counsel for the Defendant. The OPTM specifically contained a Motion to Suppress and a Motion for Discovery. On March 14, 2014, a Hearing was held in this matter. At the Hearing, counsel for the Defendant indicated that the Motion for Discovery had been satisfied by the Commonwealth and he was no longer going to pursue that particular Motion. At the conclusion of testimony, the Court took the Motion to Suppress under advisement. On March 26, 2014, counsel for the Defendant submitted a Brief in support of the OPTM. On April 10, 2014, the Commonwealth submitted a Brief in response. This Order and Opinion follow.

SUMMARY OF THE FACTS

On September 28, 2013, members of the Allentown Police Department responded to 384 Hickory Lane, Allentown, Lehigh County for a report of a stabbing. Officer Craig Berger was the first officer on scene and observed the victim, later

identified as Ahiezer Padilla-Marrero, slumped over on a chair to the left of the front door, surrounded by a group of people. Officer Berger observed that Mr. Padilla-Marrero was covered in blood and non-responsive. He radioed EMS and directed them to come to the scene immediately.

Officer Berger spoke to members of the group and learned that a disturbance had occurred earlier in one of the upstairs apartments. Officer Berger observed blood droplets on the steps, leading into the apartment building. He followed those blood droplets to apartment D3. At that point, Officer Kyle Pammer joined him and they determined that the apartment door was locked. The officers knocked on the door, paused for 20 seconds, knocked again on the door, and announced their presence as police officers. Officer Berger radioed the police sergeant and advised that he and Officer Pammer were going to enter the apartment. Sergeant Alicia Conjour, now positioned outside of the apartment building, advised that she observed a male appear in a window of the apartment.

When no response was made from the inside of the apartment, Officer Berger delivered one kick to the door and was able to enter the apartment. Once inside, Officer Berger heard footsteps and heard a door close. Upon entering the apartment, Officer Berger observed a dining room and kitchen, and blood on the carpet, walls, furniture and kitchen sink area. Officer Berger also noticed two doors. The left door was open and Officer Berger was able to determine that the door led to a bathroom. The door to the right was closed. Officer Howells, now present in the apartment, announced that whoever was inside should come out. Approximately 10 seconds later, a male emerged, wearing only blue jeans. The man had blood splatter on his face and chest area and kept looking back into the room. Officer Howells and Sergeant Conjour trained their Taser guns on the Defendant as he came out of the

3

room. Ultimately, Officer Berger handcuffed the male. The police located two minor children in the room.

Once handcuffed, the male was led to the kitchen area and was seated at the table. Officer Berger noted injuries to the man's head and blood on his torso. He contacted EMS to respond to the apartment to treat the Defendant. Officer Berger then obtained basic information from the male, including his name and date of birth, and kept him under observation.

While seated at the table, the male, identified as the Defendant in this matter, Hector Luis Gonzalez, began to talk to the officer, despite not being asked any questions by the officers on scene. Speaking in "broken" English, the Defendant related that the victim had eaten all of his food. The Defendant confronted the victim and the victim punched him in his face. The victim grabbed a knife and the Defendant responded by grabbing a knife himself. The Defendant, while crying, repeatedly asked Officer Berger, "What would you do?" Officer Berger did not answer the Defendant, nor did he ask him any questions, other than his name and date of birth at the beginning of the encounter. The Defendant was not given any *Miranda* warnings by Officer Berger.

Detective Raymond Ferraro had arrived on scene and began to speak with the Defendant, again obtaining basic information. Detective Ferraro, unable to speak Spanish, believed that there may be a language barrier and requested that Officer Miguel Villa respond to the scene to assist in translation. Officer Villa is bilingual in Spanish and English. Detective Ferraro, Officer Villa, and the Defendant were seated at the kitchen table and Officer Villa advised the Defendant of his *Miranda* warnings in Spanish, after Detective Ferraro read them aloud in English. The Defendant verbally

acknowledged that he understood his rights and was also given a written *Miranda* warning form to read, which was written in both English and Spanish. The Defendant appeared to read the form and signed it, acknowledging that he understood his rights, in Officer Villa's presence. The Defendant appeared sober and responded in both English and Spanish to questions posed to him.

Detective Ferraro requested that the Defendant's handcuffs be removed and he began to speak to the Defendant. At times, the Defendant would answer in English and when he answered in Spanish, Officer Villa translated for Detective Ferraro. The Defendant denied any drug or alcohol use. The Defendant related that he had moved into the apartment two weeks prior to the incident. On that night, he had come home with his children and had bathed them. He then attempted to make some food for the children when he discovered that the food he intended to make was gone. The Defendant confronted the victim about the food disappearance and the victim punched the Defendant in the face. The victim then grabbed a knife. The Defendant could not recall what happened at that point and suggested that perhaps the victim stabbed himself.

The Defendant did make inquiry about using the restroom, both in English and Spanish, but was denied access at that time due to the fact that he had blood on his body and the possibility of destruction of evidence.

At the apartment, Detective Ferraro contacted First Assistant District Attorney Steven Luksa and had Aggravated Assault charges approved. A short time later, Detective Ferraro learned that the victim had died. The interviewed was terminated.

Detective Ferraro contacted Attorney Luksa and Detective Joseph Vazquez and the Defendant was transported to Allentown Police Headquarters. At headquarters, a videotaped interview with the Defendant was conducted. The Defendant was informed

the Detective Vazquez spoke Spanish and was available to translate during the interview. The Defendant was again *Mirandized*, and he again completed the written waiver of his rights. The detectives advised the Defendant that the victim had died and the Defendant immediately began to cry. Again, the Defendant related the same account of the incident that he had related to Detective Ferraro in the apartment. He further stated that the altercation had taken place minutes before officers began to arrive at the apartment. Detective Ferraro observed that the Defendant had a large gash on his leg and wounds to his torso, back and neck.

DISCUSSION AND CONCLUSIONS OF LAW

In his Motion to Suppress, the Defendant argues that the statements he made to Officer Berger while in the apartment prior to being advised of his rights pursuant to *Miranda* were the product of an illegal custodial interrogation and were not spontaneous utterances. Next, he argues that although he signed a waiver of his constitutional rights at the apartment prior to giving statements to Detective Ferraro, he did not knowingly and voluntarily give up those rights. Finally, the Defendant argues that because his rights were constitutionally violated by the police at the apartment, that the statements made during his videotaped interview at police headquarters ought to be suppressed as fruits of the poisonous tree.

It is well settled that "[a] law enforcement officer must administer *Miranda* warnings prior to custodial interrogation." *Commonwealth v. Mannion,* 725 A.2d 196, 200 (Pa. Super. 1999)(citing *Commonwealth v. Johnson,* 541 A.2d 332, 336 (Pa. Super. 1988). The Commonwealth does not dispute that the Defendant was in custody at the time he made the statements to Officer Berger, Detective Ferraro, or at police headquarters. Therefore, this Opinion will only address the "interrogation" alleged by the Defendant.

6

"[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980). By way of further explanation, "[i]nterrogation" is police conduct "calculated to, expected to, or likely to evoke admission." *Johnson* at 336 (quoting *Commonwealth v. Simala*, 252 A.2d 575, 578 (Pa. 1969). "[S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Innis* at 302. "When an inculpatory statement is not made in response to interrogation by police officers, however, 'the statement is classified as a volunteered statement, gratuitous and not subject to suppression for lack of warnings.'" *Johnson* at 336 (citing *Commonwealth v. Whitley*, 500 Pa. 442, 445, 457 A.2d 507, 508 (1983) (citations omitted)).

From the testimony taken at the OPTM Hearing, it appears that the statements made by the Defendant to Officer Berger were not a result of interrogation by the police. Officer Berger testified that the Defendant was merely asked his name and date of birth, normal questions pertaining to custody and/or arrest. The Defendant, on his own, began to tell Officer Berger his version of what transpired in the apartment prior to police arrival. Officer Berger testified that he did not ask the Defendant any questions regarding the event and that the Defendant himself related the event and asked Officer Berger "What would you do?" It is the Court's opinion that

Officer Berger did not interrogate the Defendant, nor did his actions rise to the level of "functional interrogation." Therefore, the statements made to Officer Berger at the apartment can be categorized as spontaneous utterances and will not be suppressed.

Next, the Defendant seeks to suppress the statements he made to Detective Ferraro and Officer Villa after he signed a formal *Miranda* right waiver form. Specifically, the Defendant argues that he was questioned in a "highly coercive atmosphere,…failed to manifest a valid understanding of *Miranda* via any verbal affirmation in English or Spanish, and had an impaired ability to understand the situation and his rights, given his wounds and lack of medical attention, the fact that he was denied access to the bathroom, the coercive nature of the interrogation, and the other attendant circumstances." See Def. Brief, 5, March 26, 2014. Specifically, the Defendant argues that the Commonwealth has not demonstrated that he understood the content of the *Miranda* warnings given to him at the apartment. He argues that the Spanish section of the *Miranda* warning form was incomplete, although the pertinent information was completed in the English language section. He further argues that although Detective Ferraro recalled asking the Defendant whether he understood the rights and the Defendant's oral affirmation that he did, Officer Villa did not recall that exchange.

"In order to avoid suppression based on a violation of *Miranda*, 'it is the Commonwealth's burden to establish whether [a defendant] knowingly and voluntarily waived his *Miranda* rights. In order to do so, the Commonwealth must demonstrate that the proper warnings were given, and that the accused manifested an understanding of these warnings.'" *Commonwealth v. Kunkle*, 79 A.3d 1173, 1180 (Pa. Super. 2013), quoting *Commonwealth v. Cohen*, 53 A.3d 882, 885-886 (Pa. Super. 2012). "In considering whether a defendant has validly waived his *Miranda* rights, the

trial court engages in a two-pronged analysis: (1) whether the waiver was voluntary, in the sense that [the] defendant's choice was not the end result of governmental pressure[;] and (2) whether the waiver was knowing and intelligent, in the sense that it was made with full comprehension of both the nature of the right being abandoned and the consequence of that choice." *Commonwealth v. Pruitt*, 597 A. 307, 318 (Pa. 2008).

At the OPTM Hearing, Detective Ferraro testified that he initially responded to the scene for a report of a stabbing. At that time, the victim was still alive. When Detective Ferraro entered the apartment, he observed the Defendant seated at the kitchen table and attempted to obtain biographical information. Shortly thereafter, Detective Ferraro determined that it would be prudent to use a Spanish translator to speak to the Defendant. He called Officer Villa to respond to the scene to assist him. At some point, Detective Ferraro requested that the Defendant's handcuffs be removed and gave the Defendant a cigarette and a drink. Upon his arrival, Officer Villa advised the Defendant of his *Miranda* rights in Spanish, using a written form supplied by the Allentown Police Department. After he read him his rights, the Defendant signed the form, indicating his understanding of his rights, and Officer Villa witnessed his signature. The interview commenced, with Detective Ferraro asking questions in English, and Officer Villa translating them for the Defendant. At times, the Defendant would answer Detective Ferraro's questions before Officer Villa could finish translating, demonstrating at least a limited ability to understand English. During the interview, the Defendant did request to use the restroom but was not permitted to use the facilities.

Nothing about the testimony provided by the Commonwealth at the time of the OPTM Hearing leads this Court to believe that the Defendant's waiver of his *Miranda*

rights was anything but voluntarily and knowingly given. The Defendant was provided with a Spanish speaking interpreter, he was uncuffed at the table, and although he was denied access to the restroom at the apartment, testimony revealed that he was denied access in order to preserve evidence. The Court does not believe that any evidence indicating "governmental pressure" as noted by *Pruitt* was demonstrated at the OPTM Hearing. Rather, testimony presented demonstrated that the Defendant at least had a limited ability to understand English, as demonstrated by his self-initiated conversation with Officer Berger and the fact that he was able to answer Detective Ferraro's questions prior to their complete translation by Officer Villa. Therefore, analyzing the Defendant's waiver of his *Miranda* rights via the two prong test outlined in *Pruitt* leads this Court to believe that the Defendant executed a knowing, voluntary and intelligent waiver of his *Miranda* rights and we will not suppress the statements made to Detective Ferraro at the apartment.

Finally, the Defendant argues that statements made at police headquarters to Detective Ferraro and Detective Vazquez ought to be suppressed as "fruits of the poisonous tree." As outlined above, the Court has determined that the statements made at the apartment were either spontaneous utterances (to Officer Berger) or statements taken after a valid waiver of his *Miranda* rights (to Detective Ferraro). We also note that the Defendant was again advised of his *Miranda* rights at police headquarters and again elected to waive those rights. Because we do not agree that the interaction between the police and the Defendant at the apartment was illegal, we do not believe that the interview at headquarters should be suppressed as "fruits of the poisonous tree."

## CONCLUSION

For all of the foregoing reasons, the Court DENIES and DISMISSES the Defendant's Omnibus Pretrial Motion.

By the Court:

_____
Kelly L. Banach, J.